THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

SIMATEX, INC.,

Plaintiff,

v.

COLONIAL MILLS, INC.,

Defendant.

Civil Action No. ___________

**JURY DEMAND**

CA 08 343S

**COMPLAINT**

1. This action for breach of contract and quantum meruit arises out of a contract between Simatex, Inc. ("Plaintiff") and Colonial Mills, Inc. ("Defendant") for the supply of yarn for use in the manufacturing of rugs. Defendant has refused to pay substantial sums due and to take in substantial inventory as called for by the contract.

2. Plaintiff is a corporation organized under the laws of the state of Georgia with its principal place of business located at 190 Bellew Carver Road, Spartanburg, South Carolina. Plaintiff purchases and sells yarns used in the manufacture of carpets and rugs.

3. Defendant is a domestic corporation with its principal place of business located at 560 Mineral Spring Avenue, Pawtucket, Rhode Island. Defendant manufactures rugs.

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are organized under the laws of and maintain their principal places of business in different states and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

5. Venue in this District is proper under 28 U.S.C. § 1391(a) because Defendant

resides in this judicial district.

6. In 2005 and 2007, Plaintiff entered into supply contracts with Defendant whereby Plaintiff sold Defendant yarn for use in Defendant's rugs. In 2006, Plaintiff submitted a contract form but was not awarded the supplier's contract.

7. To meet its obligations under these contracts, Plaintiff purchased un-dyed yarn and shipped it to a dyer who dyed the yarn and shipped it directly to Defendant.

8. Among the yarn types provided by Plaintiff for Defendant was "space-dyed" yarn. Space-dyed yarn typically features minimal dye and uses the natural color of the yarn to create a random color pattern with esthetic appeal. However, for years, Defendant's practice has been to request that its space-dyed yarn be "saturated" to produce deep, dark colors. The dye saturates 100% of the white yarn, leaving it without any spacing. Further, a bundle of this saturated yarn comprises the entire product, unlike a typical space-dyed rug or carpet.

9. Defendant has requested a space-dyed yarn product from Plaintiff and other suppliers, which, because of the heavy and complete dye saturation required to meet Defendant's color requirements, cannot pass independent laboratory colorfastness testing.

10. Defendant acknowledges historically having received a small number of claims each year from individuals who purchased Defendant's rugs that the rugs had allegedly "bled" onto other nearby flooring or carpeting. Defendant has received such claims about rugs featuring yarn not supplied by Plaintiff.

11. Jason Simon negotiated the 2007 contract between Plaintiff and Defendant ("the Contract") on behalf of Plaintiff. Mr. Simon eliminated from the Contract Section C. 1. Labeled "Product Standards" and related to colorfastness. Mr. Simon had also done this on the 2005 contract between Plaintiff and Defendant and a contract form for 2006, which was never

executed by Plaintiff and Defendant.

12. In or about the fall of 2007, Plaintiff learned that JC Penney, one of Defendant's largest customers, had received a claim from one of its customers about a rug manufactured by Defendant "bleeding" onto other nearby flooring or carpeting.

13. Defendant and its insurance carrier did not replace the rug or otherwise compensate JC Penney's customer. Instead, JC Penney addressed the claim itself.

14. After receiving the customer claim, JC Penney returned approximately 8,000 rugs to Defendant (the "JC Penney Return").

15. Defendant has calculated its alleged losses resulting from the JC Penney Return and has "charged back" the loss amount to Plaintiff by refusing to pay approximately the same amount worth of Plaintiff's invoices.

16. Neither before nor after the JC Penney Return did Defendant independently verify that:

(a) the rug(s) sold to the individual customer(s) whose claim(s) preceded the JC Penney Return actually featured yarn manufactured by Plaintiff as opposed to yarn manufactured by another one of Defendant's suppliers;

(b) the returned rugs all featured yarn manufactured by Plaintiff as opposed to yarn manufactured by another one of Defendant's suppliers; or

(c) that a certain percentage of the returned rugs would not pass independent laboratory colorfastness testing.

17. Defendant continued to order, accept and incorporate into its rugs yarn manufactured by Plaintiff for at least eight months after the JC Penney Return.

18. After the JC Penney Return, Defendant received a new sales opportunity with JC

Penney. Also after the JC Penney Return, Defendant was able to re-sell some or all of the returned rugs to a third-party. Defendant did not pass any of the proceeds of such third-party re-sales on to Plaintiff in payment of the invoices unpaid because of the JC Penney Return.

19. A JC Penney customer who initiated a claim in 2007 about a rug manufactured by Defendant "bleeding" onto nearby surroundings admitted that he/she did not use an underlay, or floor padding, under his/her rug. Use of floor padding is recommended by Defendant to rug purchasers to, among other things, prevent yarn color dye transfer. Such recommendation is noted on the packaging or labeling of Defendant's rugs.

20. Defendant entered into the Contract with knowledge of the composition and features of the space-dyed yarn it would receive.

21. Prior to and during 2007, Defendant had reason to believe that the space-dyed yarn it was incorporating into the rugs it manufactured would not pass independent laboratory colorfastness testing.

22. Defendant did not request of Plaintiff that any yarn supplied by Plaintiff undergo such testing. Defendant did not request from Plaintiff results of any such tests.

23. Plaintiff is currently holding inventory that it produced for Defendant under the Contract.

24. Defendant was obligated to take in all such remaining inventory by no later than April 17, 2008. Defendant has repeatedly acknowledged its obligation to take in such inventory and to pay for it in full no later than June 17, 2008.

25. Defendant has not taken in all such remaining inventory.

**COUNT I**
**(Breach of Contract)**

26. Plaintiff hereby re-alleges and incorporates paragraphs 1 - 25 above.

27. Defendant has breached the Contract by refusing and failing to perform their obligations under that Contract, specifically their failure to pay invoices and to take in remaining inventory.

28. Defendant's conduct has caused and continues to cause damage to Plaintiff.

**COUNT II**
**(Quantum Meruit)**

29. Plaintiff hereby re-alleges and incorporates paragraphs 1 - 28 above.

30. Defendant has been unjustly enriched by its retention of benefits received in connection with Plaintiff's performance of its obligations under the Contract.

31. Defendant's conduct has caused and continues to cause damage to Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Simatex, Inc. respectfully requests that this Court:

(a) enter judgment in Plaintiff's favor and against Defendant on count I of the Complaint and award damages in an amount to be determined by the trier of fact;

(b) enter judgment in Plaintiff's favor and against Defendant on count II of the Complaint and award damages in an amount to be determined by the trier of fact;

(c) award Plaintiff attorneys' fees and costs; and

(d) award Plaintiff such other and further relief as this Court deems just and proper.

**SIMATEX, INC.**

By its attorneys,

Joseph V. Cavanagh, Jr. #1139
Joseph V. Cavanagh, III #6907
Blish & Cavanagh, LLP
30 Exchange Terrace
Providence, Rhode Island 02903
Telephone: (401) 831-8900
Facsimile: (401) 751-7542
jvc@blishcavlaw.com
jvc3@blishcavlaw.com